COMMONWEALTH *vs.* LUIS ALBERTO MONTALVO BORGOS.[1]

Bristol. September 7, 2012. - December 21, 2012.

Present: IRELAND, C.J., CORDY, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Practice, Criminal,* Motion to suppress, Witness. *Constitutional Law,* Identification. *Due Process of Law,* Identification. *Identification. Evidence,* Identification, Credibility of witness, Redirect examination. *Witness,* Credibility, Redirect examination. *Controlled Substances.*

There was no error in the denial of a criminal defendant's pretrial motion to suppress the out-of-court photographic identifications made by several witnesses, in that, as to two of the witnesses, the record supported the judge's findings that they had sufficient opportunity to view the defendant prior to the shooting [32-34]; and in that the defendant failed to establish that the police employed unconstitutionally suggestive identification procedures [34-35].

At a murder trial, there was no error in the admission of a police officer's testimony on redirect examination that two other witnesses feared for their lives or in the prosecutor's reference to that fact during his closing argument, where the prosecutor elicited the testimony in response to a suggestion made by the defense on cross-examination of the officer. [35-36]

At a murder trial, the admission of testimony that the defendant sold drugs did not create a substantial likelihood of a miscarriage of justice. [36-37]

INDICTMENT found and returned in the Superior Court Department on June 29, 2007.

A pretrial motion to suppress evidence was heard by *Robert J. Kane,* J., and the case was tried before *John P. Connor, Jr.,* J.

*Greg T. Schubert* for the defendant.

*Tara L. Blackman,* Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. On November 24, 2009, a jury convicted the defendant, Luis Alberto Montalvo Borgos, of murder in the first degree on the theory of deliberate premeditation. Represented by new counsel on appeal, the defendant argues error in (1) the

---

[1]As is our custom, we spell the defendant's name as it appears in the indictment.

denial of his motion to suppress out-of-court photographic identifications made by four witnesses; (2) the admission of testimony that two witnesses feared for their lives; and (3) the admission of testimony that the defendant sold drugs. The defendant also seeks relief pursuant to G. L. c. 278, § 33E. We affirm the defendant's conviction and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1. *Facts.* The jury could have found the following facts. On Friday, May 11, 2007, the victim; his girl friend, Sheena Castle; and their daughter, who was four years of age, went to Fall River to visit Castle's mother, Sharon St. Pierre. St. Pierre lived in an apartment on the second floor of a three-story apartment building. Jose Mercado Matos, known as Jolky, and his then girl friend, known as Liz, lived in an apartment above St. Pierre.[2] Jolky's twin brother, Osvaldo Mercado Matos, known as Valdo,[3] and his girl friend,[4] lived across the hall from Jolky. Yanelly Lorenzi[5] and her boy friend, Raymond Cordeiro, lived in an apartment under St. Pierre. Cordeiro, who had a heroin "problem" and had previously spent time in prison for selling drugs, was friends with the third-floor residents. Jolky and Valdo were known to sell drugs.

After arriving at St. Pierre's home, the victim, Castle, and their daughter went out to visit a friend. At about 9 or 10 P.M., St. Pierre went to bed. Meanwhile, in the apartment building next to St. Pierre's, Valdo went to visit Eduardo Rosario, who lived in a third-floor apartment with his wife, Vilmarie. At around 10 P.M., the men started drinking and watched television in the living room. Vilmarie had gone to bed. As the evening progressed, Valdo became increasingly intoxicated.

Sometime after 1 A.M., now May 12, the victim, Castle, and their daughter returned to St. Pierre's apartment building. For a while, the couple talked inside the victim's automobile, which was parked in front of St. Pierre's apartment. Eventually, the

[2]The defendant was staying with them.

[3]We will refer to some witnesses by their first names.

[4]Valdo's girl friend was the sister of Jolky's girl friend.

[5]Yanelly, prior to the trial, went by the name Monica Irene because there were warrants out for her arrest. Neither she nor her sister, Leisa, who also testified at trial, was truthful initially about Yanelly's true identity.

couple got out of the automobile, and as they did, the victim accidentally set off its alarm.

Although the victim shut the alarm off within seconds, the noise agitated Valdo, who began shouting out of Rosario's third-floor window. Valdo called the victim racist slurs and said, "I got something for you." The argument lasted about fifteen minutes. From a window of her apartment, Liz tried to stop the argument. Hearing the noise, St. Pierre telephoned 911, but hung up. The victim, Castle, and their daughter went inside.

Soon thereafter police arrived at St. Pierre's apartment to investigate the aborted 911 telephone call. St. Pierre lied to the officers, telling them that her granddaughter had made the telephone call while she was "playing with the phone." The police left and St. Pierre locked the door. Within minutes St. Pierre and Castle saw the defendant, who they subsequently identified in a photographic array, break through the door, yell at the victim in Spanish, and point a gun at him. As St. Pierre and Castle fled, they heard multiple gunshots. The victim died as a result of gunshot wounds to his torso with perforations to his heart, lung, and pelvic bone.

St. Pierre and Castle were not the only persons who had information concerning the shooting. Just after the police left St. Pierre's apartment, at around 2:50 A.M., Liz saw the defendant outside yell up to Valdo, who was still in Rosario's apartment. Liz testified[6] that she heard the defendant ask Valdo, who was in Rosario's apartment, what was going on. Valdo told the defendant that the victim was "messing" with him. The defendant stated that he was going to kill the victim. Liz interjected, asking why the defendant would do that when the victim "didn't do nothing to him." The defendant replied that he did not care. The defendant did not like the victim and found him to be "disrespectful." After this exchange, the defendant went into St. Pierre's apartment building. Liz heard multiple shots coming from St. Pierre's apartment.

Rosario's account was similar. The defendant yelled up to

---

[6]Liz initially lied to police and created a false alibi for the defendant. After she was arrested, she told the "whole story." She pleaded guilty to a charge of intimidating a witness and received probation, on condition that she testify at trial.

Valdo and asked what was going on. Rosario testified that Valdo replied, "I don't know . . . but I will fix it tomorrow." Rosario saw the defendant go inside St. Pierre's apartment building and then heard multiple shots being fired. Shortly thereafter Rosario saw the defendant leave the building. The defendant inserted a gun into his waistband and said in Spanish, "What did I do?" During this time, Valdo still was with Rosario.[7] The gunshots woke up Vilmarie to an asthma attack. Valdo left the apartment, but soon returned to report that he thought that the victim was dead. Rosario asked Valdo to leave. Rosario tended to Vilmarie and claimed that he did not hear police knocking on his door. He subsequently identified the defendant in a photographic array as the man with the gun that night.

The police later learned about the defendant's whereabouts prior to the shooting. The defendant had gone out for the evening with Yanelly, her sister Leisa, and Cordeiro to a nightclub in Providence, Rhode Island. On the way home, the defendant received a cellular telephone call and during the conversation stated, "Nobody mess with my boy," and "I'm going to kill him." The defendant had a silver gun in his hands. Yanelly told the defendant, "Think about it," and not to kill anyone. Soon after the group returned to Yanelly and Cordeiro's apartment, the defendant left.[8] Just after the defendant left, Yanelly and Leisa heard gunshots in the apartment above them. Yanelly looked outside and saw the defendant walk toward a dumpster. She then lost sight of him.

Police recovered seven discharged .22 caliber cartridge casings and two live projectiles from St. Pierre's apartment. Two spent .22 caliber rounds were recovered from the medical examiner's office. The Commonwealth's firearms identification expert opined that, based on his examination, all seven of the discharged .22 caliber cartridge casings recovered were fired from the same unknown weapon. There was no forensic evidence connecting the defendant to the shooting.

---

[7]Valdo was too drunk to recall what had occurred. He testified that he knew the defendant, but not "that well," and that he never had a conversation with him. Valdo did not hear any shots.

[8]Yanelly and Leisa separately identified the defendant as the person who had been with them before the shooting.

The defendant did not testify or call any witnesses. The defense was misidentification. The jury were instructed fully concerning how to assess the various identifications made.

2. *The photographic identifications.* The defendant contends that his motion to suppress the out-of-court photographic identifications made by St. Pierre, Castle, Rosario, and Vilmarie should have been allowed because the process "created [an] impermissible risk of misidentification."[9] After a two-day evidentiary hearing, the judge, as relevant here, denied the motion.

a. *Facts and procedural background.* We summarize the facts found by the judge, supplemented where necessary by uncontested testimony from the evidentiary hearing on the motion to suppress.[10] See *Commonwealth* v. *Watson*, 455 Mass. 246, 248 (2009); *Commonwealth* v. *Melvin*, 399 Mass. 201, 202 (1987). For a few weeks prior to the shooting, the victim, Castle, and their daughter, who were in the process of relocating, would visit St. Pierre at her apartment in Fall River. When Castle would drop off and pick up their daughter, she regularly observed the residents who lived above her mother's apartment and their friends who lived in a neighboring apartment congregating in front of her mother's building, drinking alcohol, and listening to music. One of the men in the group was the defendant, whom she had observed there repeatedly.

St. Pierre also, on many occasions, had observed the defendant outside her apartment building. She mistakenly believed, based on information from an acquaintance, that the defendant's name was "Jose." She observed Jose "a lot," seeing him "once or twice a week." She knew him to be associated with Valdo, the person who had started arguing with the victim, whom she knew to be the twin brother of the man who resided in the apartment above her (Jose).

---

[9] The judge who heard the motion to suppress the identifications was not the trial judge. He allowed the motion with regard to the out-of-court photographic identification made by St. Pierre's nephew.

[10] In support of his argument on appeal, the defendant cites to the trial testimony of various witnesses. Our review, however, is based on the facts developed at the suppression hearing, and not at the trial. See *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 795 (2009); *Commonwealth* v. *Rivera*, 441 Mass. 358, 367 (2004), quoting *Commonwealth* v. *Ramos*, 402 Mass. 209, 216 (1988) ("Evidence adduced at trial but not before the motion judge . . . cannot be determinative of the propriety of the motion judge's decision").

Neither St. Pierre nor Castle actually saw the defendant shoot the victim. However, just before the shooting, Castle heard what sounded like someone running down a flight of stairs, and she was there when the defendant pushed in the door to her mother's apartment and entered. St. Pierre responded to the noise and saw the defendant. The defendant was yelling in Spanish at the victim, and both women observed him pointing a gun at the victim. After about thirty seconds, Castle ran with her daughter to a bedroom. St. Pierre then ran out of the apartment and the building, and to her nephew's home nearby. Before St. Pierre left the apartment building, she heard two shots. As she was running up the street, she heard more shots. From a bedroom inside the apartment, Castle heard more shots being fired.

St. Pierre and her nephew returned to her apartment building. While they were outside, she saw the defendant pass by and heard him say something to her, but did not understand what he said. Police arrived at St. Pierre's apartment within minutes and began interviewing witnesses. St. Pierre told them that she knew who did it and thought that the shooter's name was Jose, but was not certain.

Police transported St. Pierre, Castle, and the granddaughter to a police station, where they were placed in separate rooms. The officers obtained information about the shooter, namely that he was a Hispanic male in his twenties who was between five feet, six inches and five feet, eight inches tall and had been wearing "three-quarter length" shorts and a baseball hat. Based on this information, that day and over the weekend, officers showed a series of photographs (none of which was of the defendant) to St. Pierre and Castle. Both selected Rosario's photograph as being someone who looked like the shooter.

After unsuccessfully attempting to contact Rosario, police composed a flyer displaying Rosario's photograph and indicated that he was wanted for questioning. After seeing the poster, Rosario went to the police station. At first, Rosario denied having any knowledge about the shooting. Eventually he gave the defendant's name (Albert) to the officers and explained that, before the shooting, the defendant had yelled up to Valdo and asked whether he was having a problem with the victim. After Valdo responded affirmatively, the defendant stated, "Well,

we'll see if that continues." Rosario watched the defendant enter the building in which St. Pierre lived, heard gunshots, then saw the defendant leave the building with a gun and run to the rear of the building.

Rosario told the officers that the defendant was Puerto Rican, had attended a party he had hosted, and had been staying at the apartment complex for a couple of weeks. Rosario described the defendant as a light-skinned Hispanic male with short dark brown hair and brown eyes who was between five feet, six inches and five feet, eight inches tall. He also stated that the defendant had tattoos on his forearms and had been wearing a white T-shirt and shorts. Officers had Rosario look at hundreds of photographs (the defendant's photograph was not among them) and although he was able to identify photographs of Valdo and his brother, he did not see the defendant's likeness.

In their investigation, officers made contact with Valdo, who admitted that the defendant was a friend of Jose. They also learned that Jose had brought the defendant to a rental store to obtain some furniture. From the rental store, police obtained a photocopy of the defendant's driver's license from Puerto Rico and confirmed that they did not have a photograph of the defendant in their system. On May 24, officers received a photograph of the defendant attached to an electronic mail message. Detective Timothy Albin was given this photograph and was asked to generate a photographic array including five other photographs that contained pictures of white males (including Hispanic males) with black hair who ranged between five feet, five inches and five feet, ten inches in height and were between twenty-five and thirty-five years of age. All six photographs in this array were black and white. Detective Albin "crop[ped]" the photograph of the defendant so that it would be the same size as the other ones used the array. In this photographic array, the defendant's photograph was the second photograph. The only marking on each photograph was a number.

Detective John McDonald showed this array to several witnesses. After telling Rosario and Vilmarie that they were going to be asked to look at some photographs, Detective McDonald instructed them that they would be kept apart and directed Vilmarie into a bathroom. Detective McDonald instructed Rosario

to concentrate on the facial features of the individuals in the photographs and advised that a person's hair length and style, and facial hair, can change. After inspecting the six photographs, Rosario selected the defendant's photograph stating that it looked like Albert and had the same eyes and lips. Detective McDonald asked about any differences between the photograph and the shooter, and Rosario remarked that the man he knows as Albert had shorter hair and "always wears a hat." In response, Detective McDonald used a piece of paper to cover the hair in the photograph. Rosario confirmed that he was "sure" that the photograph was of Albert, the person he saw with the gun.

Rosario and Vilmarie exchanged places. She was only being asked whether she recognized anyone. Detective McDonald gave her the same instructions that he had given her husband. After looking at the six photographs, Vilmarie selected the defendant's photograph as the person she knew as Albert.[11] Detective McDonald took out a piece of paper and used it to block off the defendant's hair and asked Vilmarie to look at the photograph again. She stated that she was "sure" it was Albert.

Before showing the photographs to St. Pierre, Detective McDonald, who was accompanied by another officer, instructed her to focus her attention to the facial characteristics reflected in the photographs, noting that a person's hair and facial hair may change. The six photographs were placed on a surface for St. Pierre to examine. She looked at them and pointed to the one of the defendant, stating that it "looks like the guy," and remarking that her selection was based on the man's eyes. When asked whether anything was different about the shooter, she replied that his hair was shorter. Detective McDonald then used a piece of paper to block out the hair in the photograph. St. Pierre confirmed her identification, responding that the man in the photograph had the "same eyes," and again adding that she could not forget the shooter's eyes. St. Pierre testified that no one pressured her to make this identification.

On May 25, 2007, police asked Castle to come to the station. Inside, Detective McDonald told her that he was going to show her some photographs to see whether she recognized the man

---

[11]Vilmarie recognized the defendant as someone who had been "around" her apartment for the past "[o]ne or two months."

with the gun in her mother's apartment and placed the six photographs of the array on a desk. Detective McDonald directed her to concentrate on the facial features in the photographs, stating that a person's hair and facial hair can change. Castle looked at the photographs and stated that the second photograph (which was of the defendant) "most look[ed] like" the man. She testified that she was not pressured by police to make this identification and that she was one hundred per cent sure of her identification.

After Castle's identification, police obtained a warrant for the defendant's arrest and arrested him on June 5, 2007. All the photographic identifications discussed above took place before the defendant's arrest.

The motion judge correctly concluded that, although it would have been preferable for the police to have used more than six photographs in the array, the number of the photographs in the array was permissible. See *Commonwealth* v. *Walker*, 460 Mass. 590, 604 (2011) (absent exigent or extraordinary circumstances, photographic array, whether simultaneous or sequential, must have minimum of six photographs). The judge also detailed the similarities and differences between the photographs of the five men and the photograph of the defendant, concluding that none of the differences was so pronounced to render the array conducive to irreparable misidentification.[12] See *Commonwealth* v. *Melvin*, 399 Mass. 201, 207 n.10 (1987) (differences in physical characteristics in photographic array alone not sufficient to establish that array was suggestive). The judge determined that, when the officers had presented the array to St. Pierre, Castle, Rosario, and Vilmarie, they did not engage in any suggestive techniques. The police did not bring attention to bear on any particular photograph, either directly or subtly. The officers asked only that each witness look at the photographs to see whether an identification could be made, and permissibly instructed the witnesses to focus on facial features because a person's hair may change. The judge concluded that the action of blocking the hair of the defendant was a "proper procedure" in view of the fact that hair length, style, and color may change.

---

[12]We have looked at the photographic array, and based on our review, agree with the judge that the men depicted therein possessed reasonably similar features and characteristics.

b. *Standard of review.* "When reviewing the denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error." *Commonwealth* v. *Watson,* 455 Mass. 246, 250 (2009), and cases cited. "We make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found." *Id.* "Questions of credibility are the province of the motion judge who had the opportunity to observe the witnesses." *Id.*

"For a motion to suppress a photographic identification to succeed, 'the defendant must show by a preponderance of the evidence that, in light of the totality of the circumstances, the procedures employed were so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process of law.' "[13] *Id.,* quoting *Commonwealth* v. *Miles,* 420 Mass. 67, 77 (1995). The totality of the circumstances requires examination of certain factors including the size of the array, the manner of its presentation, and the composition of the photographs therein. *Commonwealth* v. *Poggi,* 53 Mass. App. Ct. 685, 689-694 (2002).

c. *Discussion.* On appeal, the defendant argues that the identifications should have been suppressed because St. Pierre and Castle were unreliable witnesses and had selected the photograph of someone other than the defendant in arrays shown to them earlier. In particular, the defendant maintains that St. Pierre was unreliable because she lied to police about telephoning 911 prior to the shooting; was inconsistent about the name of the shooter; was inconsistent in her testimony about the duration of time she had observed the defendant around her apartment prior to the shooting (and her testimony on that point was inconsistent with Rosario's); and, in an earlier array, had selected a photograph of a person whom she "knew" was not the shooter.

---

[13] Regarding the question of admissibility where a defendant satisfies his burden, a different analysis is applied under the United States Constitution. See *Commonwealth* v. *Walker,* 460 Mass. 590, 599-600 n.13 (2011). Here, the defendant's suppression motion asserted violations of both the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. Because the standard for the admissibility of identification evidence under the Massachusetts Constitution is more favorable to a defendant than the standard under the United States Constitution, we need not consider the defendant's Federal constitutional claims concerning the out-of-court identifications. See *id.*

St. Pierre's conduct relating to the 911 telephone call does not pertain to her identification of the defendant but, rather, her credibility as a witness, which was assessed by the motion judge and was available as fodder for cross-examination at trial. Contrary to the defendant's contention, St. Pierre testified that when she told police that she believed that the defendant's name was Jose, she also told them that she was not certain. The defendant overlooks that the judge was not required to credit Rosario's time line of when the defendant first came to the area. In any event, the judge's findings, which were warranted on the evidence, demonstrate that St. Pierre had sufficient opportunity to view the defendant prior to the shooting, including at close range in her own apartment. Last, the judge did not ignore St. Pierre's earlier erroneous identifications of the shooter. Rather, he simply did not attribute much weight to those earlier identifications, pointing out how distraught St. Pierre had been initially and how the defendant's photograph was not in those arrays shown to her.

In challenging Castle's reliability, the defendant points to inconsistencies in her testimony about having seen the defendant before the shooting; her previous erroneous identification; her exhausted state immediately after the shooting; the fact that she had only seen the shooter for a "few seconds"; and the lack of strength in the identification she made of the defendant, only remarking that the defendant's photograph "looked like" the shooter. We reject these challenges. There was testimony, apart from how often Castle had seen the defendant prior to the shooting, that she certainly had seen him prior thereto and also for about thirty seconds inside the apartment just before the shooting. Thus, the judge's implicit conclusion that the victim's girl friend had sufficient time to see the defendant before the shooting is supported by the record and does not call for a different analysis by us. Although the judge did not expressly analyze the effect of Castle's exhausted condition at the time of the shooting, her identification of the defendant was made several days later and there was no evidence or argument that she then was physically or emotionally unable to make an identification. Concerning the strength of her identification, the defendant did not challenge this particular below. The record belies the defendant's argument,

as Castle testified that she was one hundred per cent certain about her identification of the defendant. See *Commonwealth* v. *Sullivan*, 436 Mass. 799, 806-807 (2002) (strength of particular identification goes to its weight, not its admissibility).

The defendant also points to certain facts as establishing an unconstitutionally suggestive identification procedure. He asserts that these identification witnesses knew either that a suspect was in custody, that a suspect's photograph would be in the array, or that his photograph would be a Puerto Rican document. Although there was conflicting testimony concerning these facts, the judge, based on his conclusions, implicitly credited the testimony of Detective McDonald that he did not tell the witnesses that he was awaiting a photograph from Puerto Rico, that there was a suspect in custody or in mind, or otherwise improperly suggest that the shooter's photograph was in the array. Last, we reject the defendant's argument that the police brought unreasonably suggestive attention to the defendant's photograph by covering his hair. The uncontested testimony at the evidentiary hearing was that the police did not "block" the defendant's hair as depicted in the photograph until *after* a positive identification had been made by the witness, which initial identification did not draw attention at all to the defendant's hair. See *Commonwealth* v. *Mobley*, 369 Mass. 892, 896 (1976) (weight may be given to evidence that witness did not rely on suggestive element in making identification). We note that the police did not block the defendant's hair at all with regard to Castle's identification. This subsequent action by the police done after the initial identification, even if susceptible to criticism, was not so suggestive as to deny the defendant due process of law.

There was no error in denying the motion to suppress the identifications of St. Pierre, Castle, Rosario, and Vilmarie. We come to this conclusion fully cognizant of the fact that the officers who conducted the identification procedures did not follow the protocol that we adopted in *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782 (2009).[14] Because the out-of-court identifications in this case took place in 2007, we do not fault

[14]In *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 797-798 (2009), we articulated a protocol going forward to be used to reduce the risks of unnecessary suggestiveness and misidentification when a photographic array is shown

the officers for failing to follow the *Silva-Santiago* protocol. See *Commonwealth* v. *Walker*, 460 Mass. 590, 600-601 (2011). Finally, we decline the defendant's invitation, made during oral argument, to require expert testimony on the issue of eyewitness identification. The admission of such testimony remains within the discretion of the judge. See *Commonwealth* v. *Bly*, 448 Mass. 473, 495 (2007).

3. *Admission of evidence that certain witnesses feared for their lives.* At trial, during the redirect examination of Detective McDonald, the prosecutor elicited testimony that Rosario and Vilmarie were "put up in a hotel" because they feared for their lives. There was no objection. The defendant argues that the admission of this testimony, along with the prosecutor's reference to it during his closing argument, created a substantial likelihood of a miscarriage of justice because the jury would have inferred that the defendant had threatened the witnesses. See *Commonwealth* v. *Martinez*, 431 Mass. 168, 174 (2000) (error to permit witness's testimony that she had been threatened because prejudicial effect of that testimony outweighed its probative value).

There was no error. The prosecutor elicited the testimony in response to the defendant's suggestion, made during the cross-examination of Detective McDonald, that the Commonwealth had paid for Rosario and Vilmarie to have a hotel room in exchange for their testimony. "The purpose of redirect examination is to explain or rebut adverse testimony or inferences developed during cross-examination." *Commonwealth* v. *Hoffer*, 375 Mass. 369, 375 (1978). See *Commonwealth* v. *Arriaga*, 438 Mass. 556, 577 (2003) (defendant "essentially invited the Commonwealth to address the issue on redirect examination, and the

to an eyewitness. A witness should be told, at a minimum, that "he will be asked to view a set of photographs; the alleged wrongdoer may or may not be in the photographs depicted in the array; it is just as important to clear a person from suspicion as to identify a person as the wrongdoer; individuals depicted in the photographs may not appear exactly as they did on the date of the incident because features such as weight and head and facial hair are subject to change; regardless of whether an identification is made, the investigation will continue; and the procedure requires the administrator to ask the witness to state, in his or her own words, how certain he or she is of any identification." *Id.* We also cautioned that a double-blind procedure is the better practice to use and that it is important accurately to document the identification procedure. *Id.* at 797, 799.

Commonwealth was entitled to do so in an attempt to rehabilitate its witness"). Further, on recross-examination, defense counsel brought out that Rosario and Vilmarie feared the Matos brothers (Jolky and Valdo), not the defendant. This testimony served to minimize any prejudicial effect of the challenged testimony.

Similarly, the prosecutor's reference in his closing argument to the fact that Rosario and Vilmarie moved to a hotel because they were afraid was a proper response to the defense argument that these witnesses got "a hotel" and "[their] rent paid" in exchange for their testimony. See *Commonwealth* v. *Anderson,* 411 Mass. 279, 286 (1991) (not improper for prosecutor to respond to arguments raised by defense). There was no error.

4. *Admission of testimony that the defendant sold drugs.* We reject the defendant's argument that the admission of testimony by St. Pierre and Yanelly that the defendant sold drugs created a substantial likelihood of a miscarriage of justice,[15] see *Commonwealth* v. *Wright,* 411 Mass. 678, 681 (1992), because the evidence was not relevant and its prejudicial effect outweighed any probative value. In the case of St. Pierre's testimony, the isolated reference to the defendant being a person known to her as one who sold drugs came in response to questions by the prosecutor that aimed to establish the existence of a connection between St. Pierre and the defendant before the shooting. The so-called prior connection occurred on the afternoon before the shooting when St. Pierre allegedly attempted to purchase drugs from the defendant. This evidence was relevant to St. Pierre's identification of the defendant, which the defense maintained was inaccurate. Yanelly's testimony that the defendant was known to her as a person who sold drugs came during her redirect examination. This testimony was a proper response to testimony and inferences that defense counsel developed during Yanelly's cross-examination suggesting that it was more likely that one of the Matos brothers or Yanelly's boy friend was the person to whom St. Pierre had spoken in an attempt to purchase drugs earlier that day (and thus was the shooter) in view of their involvement in drug activity and the defendant's alleged inability to speak English.[16] See *Commonwealth* v. *Hoffer, supra.*

---

[15] The defendant did not object to the admission of this testimony.

[16] It is worth noting that it was expected from the outset of the trial that

Regardless, neither witness's testimony concerning the defendant's being a person who sold drugs could have resulted in a substantial likelihood of a miscarriage of justice. There was no suggestion at trial that the shooting was drug related, and the prosecutor did not argue that the defendant's drug-dealing activities made him more likely to be the shooter. It was undisputed that many of the Commonwealth's witnesses sold or used drugs. The issue of drugs went to the credibility of the witnesses and was used by the defense to suggest that the shooter was someone other than the defendant. The issue was fully examined during the voir dire of prospective jurors, see note 16, *supra*. Last, there were several other witnesses who saw the defendant before or after the shooting, including Rosario, Vilmarie, Castle, and Leisa, who identified the defendant during the police investigation. We are convinced that the jury would not have reached a different result even in the absence of the isolated references.

5. *G. L. c. 278, § 33E.* There is no basis for relief pursuant to G. L. c. 278, § 33E.

*Judgment affirmed.*

---

such evidence would be admitted. Although it would have been preferable for the judge to have provided a limiting instruction concerning the testimony's use at the time of its admission, the judge minimized any potential prejudicial effect during voir dire when he specifically advised prospective jurors that there may be evidence in the case that the defendant was selling drugs and inquired whether such evidence would interfere with the ability to render an impartial verdict. See *Commonwealth* v. *John*, 442 Mass. 329, 338 (2004), and cases cited (limiting instruction and voir dire questions may minimize prejudicial effect of evidence).