NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11667

COMMONWEALTH  vs.  TAMIK KIRKLAND.


Hampden.     November 7, 2022. - February 22, 2023.

Present: Budd, C.J., Gaziano, Cypher, Kafker, & Georges, JJ.


Homicide. Identification. Evidence, Identification, Photograph, Expert opinion, Third-party culprit. Witness, Expert. Constitutional Law, Assistance of counsel. Practice, Criminal, Assistance of counsel, New trial, Capital case.


Indictments found and returned in the Superior Court Department on June 9, 2011.

The cases were tried before Tina S. Page, J., and a motion for a new trial, filed on September 26, 2016, was heard by Michael K. Callan, J.


Merritt Schnipper for the defendant.
Joseph G.A. Coliflores, Assistant District Attorney, for the Commonwealth.


KAFKER, J.  A jury convicted the defendant, Tamik Kirkland, of murder in the first degree on the theory of deliberate premeditation for the death of Sheldon Innocent (victim), who was fatally shot at a Springfield barbershop.  The defendant was

also convicted on several related charges connected to the barbershop shooting and a subsequent altercation with police at a private residence in which the defendant shot a police officer who was trying to arrest him.[1]  The defendant now appeals from his convictions of murder in the first degree, armed assault with intent to murder, and assault and battery by means of a dangerous weapon causing serious bodily injury, as well as from the denial of his postconviction motion for a new trial.

On appeal, the defendant raises three principal arguments. First, he argues that his trial counsel were ineffective because they failed to present expert testimony on the impossibility of the defendant matching eyewitness descriptions of the perpetrator due to his hairstyle.  Second, he asserts that they were ineffective for failing to present expert testimony on eyewitness misidentification, based on environmental factors and impermissibly suggestive photographic array procedures used by police.  Third, the defendant argues that the trial judge erred in excluding certain third-party culprit evidence on the basis that it did not provide a "substantial connecting link" between

---

[1] In addition to the conviction of murder, the defendant was convicted of three counts of armed assault with intent to murder, two counts of assault and battery by means of a dangerous weapon, one count of assault and battery by means of a dangerous weapon causing serious bodily injury, two counts of unlawful possession of a firearm, and two counts of unlawful possession of a loaded firearm, sawed off shotgun, or machine gun.

the third party and the victim's murder, and that the judge who denied his motion for a new trial (motion judge) erred in his evaluation of the defendant's ineffective assistance of counsel claim, where the defendant presented additional third-party culprit evidence that was not presented at trial. The defendant also argues that each of these errors should have entitled him to a new trial. Finally, the defendant argues that he is entitled to a new trial pursuant to G. L. c. 278, § 33E.

We discern no reversible error in our review of the defendant's direct appeal or the postconviction motion for a new trial. Having thoroughly examined the record, we also conclude that there is no reason to grant relief under G. L. c. 278, § 33E. Thus, we affirm the defendant's convictions and the denial of his postconviction motion.

1. Background. a. Facts. We summarize the facts that the jury could have found at the defendant's trial, reserving certain details for our discussion of the legal issues.

At around noon on a balmy Saturday, April 30, 2011, Darryl King was giving the victim a haircut at a Springfield barbershop when the defendant, wearing a black sweatshirt with a hood ("hoodie"), black T-shirt, jeans, and black gloves, walked backwards into the barbershop. The hood was pulled "over his head," but King noticed that the defendant's hair was braided.

The defendant turned around, and King made eye contact with him, noticing his eyes were red. King asked the man whether he wanted a haircut. The defendant said nothing as he pulled out two firearms, one at a time, from the front pocket of the hoodie. Seeing the guns, King said, in part, "Don't shoot me, man." The defendant began shooting inside the barbershop at around 12:04 P.M.[2] King was shot eleven times but survived.[3] The victim was shot four times and succumbed to his injuries.

Rodney Ball, who was at a convenience store next door, heard the shots, left the store, and saw a Black man with medium-brown skin, standing five feet, seven inches to five feet, eight inches tall, in jeans and a black hoodie with the hood "on his head," leaving the barbershop and walking "briskly" towards Montrose Street. Local and State law enforcement were dispatched to the barbershop and directed to look for a "suspect dressed in dark clothing," including a black hoodie, with a "slim build, running from the scene" down Montrose Street and toward Burr Street.

---

[2] ShotSpotter technology alerted Springfield police to the sound, detected as an acoustic "impulse sign," of gunshots in the vicinity of State and Montrose Streets at around 12:04 or 12:05 P.M.

[3] King testified that the defendant first shot him seven or eight times and then returned to shoot him three more times.

The defendant entered a house on Burr Street through the back door and encountered Lekeanna Carter styling Carolyn Wright's hair in the living room.  A third woman, Linka Baulkman, and two infants -- Baulkman's and Carter's -- were also present.  The defendant was wearing a black hoodie with the hood off his head, black pants, and black gloves, and he was holding a cell phone and chrome-topped pistol.  Talking into the cell phone, he looked out the windows and asked about a car coming for him.  He then pulled a second black pistol from his waist area and hid it in a reclining chair.  He also asked Baulkman for a change of clothes, which she provided.

Meanwhile, Carter and Wright fled upstairs with Carter's baby, leaving the defendant downstairs.  While they were upstairs, the defendant left the house and got into the open trunk of a gray Chevrolet Impala that had backed into the driveway.  As the driver attempted to leave, State and local law enforcement surrounded the vehicle.  The trunk opened and, at approximately 12:16 P.M., the defendant began shooting at police, hitting State police Trooper Stephen Gregorczyk in his bulletproof vest.  Police returned fire, wounding the defendant. Law enforcement then pulled the defendant, wearing dark-colored pants and sneakers, from the trunk and confiscated a Taurus pistol from him.  The defendant was taken into custody, transported to the hospital, and hospitalized for his injuries.

Police secured the Burr Street house and, after obtaining a search warrant, discovered a pair of black gloves and a black firearm -- later identified as a Ruger pistol -- stuffed "between the cushion and the armrest" of a reclining chair in the living room. The Ruger had "no rounds in the weapon or in the magazine."[4] Behind the recliner, police found "an item of black clothing on the floor" that matched the description of the black hoodie worn by the barbershop shooter. Investigators also collected evidence from the driveway, including a pair of black jeans, a second pair of jeans, and Nike sneakers.

A few hours after the shooting, police interviewed King in the hospital, took a statement from him, and showed him an array of eight frontal view photographs, from which he selected the defendant's photograph as the barbershop shooter. This array was also shown to Ball, who selected two photographs, including one of the defendant, as "possibly" being the person he saw leaving the barbershop after he heard shots fired, but he was not entirely sure.

Police also took a statement from, and conducted an array with, Wright that afternoon. Wright was only "[fifty] percent" sure that she recognized, from the frontal view array, the

---

[4] Investigators also recovered two other firearms from the residence. Neither of these weapons matched the ballistics evidence from the barbershop or the driveway.

defendant as the man with the gun inside the Burr Street house but identified him based on his eyes and confirmed the identification from a profile view array, this time also recognizing his "cornrow" hairstyle. Carter also gave a statement to police that day, describing the man at the house as having dark skin and wide eyes. At trial, she further recalled the defendant, the man she saw at the house, being average height and slim but with a bit of muscle.

A State police ballistics expert conducted test firings with the Taurus pistol confiscated from the defendant and the Ruger pistol recovered from the reclining chair. He then compared these firings with shell casings recovered from the barbershop and the driveway. Certain shell casings from the barbershop matched the Ruger pistol, while others matched the Taurus pistol.[5] Shell casings recovered from the driveway also matched the test firings from the Taurus pistol fired by the defendant while he was in the trunk of the car.

---

[5] The ballistics expert also testified that some bullet fragments recovered from the barbershop were "similar to the test firings from the Ruger pistol" but there were "not enough individual markings left . . . to identify them positively" as having come from that gun, though the fragments had "identical land and groove impressions to th[e] test firing from that Ruger pistol." He reached the same conclusion of similarity for a different set of fragments vis-à-vis the Taurus pistol. Defense trial counsel objected twice to the introduction of what they deemed "inconclusive findings," but the trial judge overruled both objections.

Samples from the Ruger pistol, black sweatshirt, and gloves recovered from the living room of the Burr Street house were submitted to the State police crime laboratory (crime lab) for deoxyribonucleic acid (DNA) testing. Analysis of the interior of the gloves revealed a complex mixture of four profiles, including one major DNA profile that matched the defendant's profile.[6] Analysis of "the interior cuffs and interior tag area from the sweatshirt" found in the living room also revealed "a complex mixture" of four profiles, including one major DNA profile that matched the defendant's.[7] "No detectable human DNA was recovered from" the Ruger pistol. The crime lab also tested for gunshot residue on the gloves and the black sweatshirt from the living room.[8] The sweatshirt sleeves and front pocket tested positive for gunshot residue, as did the gloves.

---

[6] The DNA analyst testified that the odds of a match such as the defendant's occurring in a randomly selected unrelated individual were between one in 916.6 billion and one in 458.5 trillion.

[7] The DNA analyst testified that the odds of a match such as the defendant's occurring in a randomly selected unrelated individual were between one in 2.157 quintillion and one in 10.28 sextillion.

[8] The forensic scientist from the crime lab testified that she did not receive a second sweatshirt, found in the second-floor bedroom of the Burr Street house, for testing. A sample from this item was tested as part of postconviction proceedings, however, revealing a major DNA profile that did not match the defendant.

b.  Procedural history.  A grand jury indicted the defendant on sixteen separate counts, including murder in the first degree.[9]  Prior to trial, the defendant moved to suppress King's and Ball's identifications, arguing that the police used an "impermissibly suggestive identification procedure" by using a photograph of the defendant with a distinctive braided hairstyle different from the hairstyles of the men in the other photographs in the array; the witnesses were primed to identify the defendant as the barbershop shooter because the defendant had appeared in media reports "in the days leading up to the shooting" because of his escape from State prison; and the witnesses "had a limited opportunity to observe the assailant." After a three-day hearing, the judge, who was also the trial judge, denied the suppression motion, finding that the

---

[9] The indictments charged murder in violation of G. L. c. 265, § 1; home invasion in violation of G. L. c. 265, § 18C; armed assault with intent to murder in violation of G. L. c. 265, § 18 (b); assault and battery by means of a dangerous weapon in violation of G. L. c. 265, § 15A (b); assault and battery by means of a dangerous weapon resulting in serious bodily injury in violation of G. L. c. 265, § 15A (c) (i); unlawful possession of a firearm in violation of G. L. c. 269, § 10 (a); unlawful possession of a loaded firearm, sawed off shotgun, or machine gun in violation of G. L. c. 269, § 10 (n); unlawful possession of a large capacity weapon in violation of G. L. c. 269, § 10 (m); and unlawful possession of a large capacity feeding device in violation of G. L. c. 269, § 10 (m). The Commonwealth ultimately entered nolle prosequi on the indictments charging home invasion, unlawful possession of a large capacity weapon, and unlawful possession of a large capacity feeding device.

photograph of the defendant used in the police array was "not so singularly distinctive" that it was impermissibly suggestive and that mere exposure to the defendant's image in the media was not grounds for suppression.

The defendant was tried before a Superior Court jury in May and June of 2013. At trial, the defendant sought to introduce reasonable doubt by suggesting that he did not have cornrows as claimed by several eyewitnesses but that a third-party culprit did fit that description, and so the defendant could not have been the barbershop shooter. Following trial, the jury convicted the defendant on all counts brought to trial, including murder in the first degree on a theory of deliberate premeditation. The trial judge sentenced the defendant to life in prison without parole on the murder conviction and numerous concurrent terms on the lesser crimes.

The defendant timely appealed and was appointed postconviction counsel. Following several unsuccessful motions and changes in postconviction counsel, the defendant filed a motion for a new trial, which was denied, after an evidentiary hearing, on September 27, 2021.[10] The denial of that motion and his direct appeal were consolidated into this single appeal.

---

[10] On September 26, 2016, the defendant filed a pro se motion for a new trial, which he amended on May 22, 2017, and was granted further leave to supplement on January 19, 2018,

2. Discussion. "Where, as here, an appeal from the denial of a defendant's motion for a new trial has been consolidated with a direct appeal from a conviction of murder in the first degree, we review both under G. L. c. 278, § 33E." Commonwealth v. Moore, 480 Mass. 799, 805 (2018). The defendant addresses three primary issues on appeal: the impossibility of his having cornrows on the day of the murder, eyewitness misidentification based on several factors, and the existence of a third-party culprit. He argues that trial counsel provided him with ineffective assistance and the trial and motion judges committed reversible errors. We address each issue in turn.

a. Cornrows. Several eyewitnesses who identified the defendant as the barbershop shooter and the man at the Burr Street house described him as having braided hair, specifically cornrows. The defendant argues that trial counsel provided him with ineffective assistance by failing to introduce photographs showing him without cornrows in the weeks leading up to the barbershop murder and present expert testimony on hair growth. Having presented this argument in his motion for a new trial, he

_____

after receiving new appointed counsel on August 24, 2017. The defendant also filed a motion for forensic and scientific testing analysis on July 6, 2018, which was denied on July 13, 2018. Appointed postconviction counsel was again replaced on October 12, 2018. The defendant filed additional motions to pursue lines of investigation throughout 2019 and 2020, as well as a supplemental motion for a new trial on June 3, 2019.

also argues that the motion judge erred in denying him a new trial on these grounds.

i.  Standard of review.  A.  Ineffective assistance of counsel.  When evaluating ineffective assistance of counsel claims in connection with the direct appeal of a conviction of murder in the first degree, "we review for a substantial likelihood of a miscarriage of justice by asking whether there was error and, if so, whether the error was likely to have influenced the jury's conclusion" (citation omitted). Commonwealth v. Don, 483 Mass. 697, 704 (2019).  This standard applies "even if the action by trial counsel does not constitute conduct 'falling measurably below that . . . of an ordinary fallible lawyer.'"  Id., quoting Commonwealth v. Gonzalez, 443 Mass. 799, 808-809 (2005).

"In conducting this review, we 'accord tactical decisions of trial counsel due deference.'"  Don, 483 Mass. at 704-705, quoting Commonwealth v. Evans, 439 Mass. 184, 195, cert. denied, 540 U.S. 923 (2003).  "Unless such a decision was manifestly unreasonable when made, we will not find ineffectiveness."  Don, supra at 705, quoting Evans, supra at 195-196.  "[O]nly strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent" rise to the level of manifestly unreasonable (quotation and citation omitted).

Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), S.C., 478 Mass. 189 (2017).

B. Motion for a new trial. "'A motion for a new trial is addressed to the sound discretion of the trial judge,' who may grant a new trial 'if it appears that justice may not have been done'" (alteration omitted). Commonwealth v. Jacobs, 488 Mass. 597, 600 (2021), quoting Kolenovic, 471 Mass. at 672. "We review a decision on a motion for a new trial for an abuse of discretion," ascertaining whether the denial "resulted from 'a clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives.'" Jacobs, supra, quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

"Where a judge conducts an evidentiary hearing, we 'accept the judge's findings where they are supported by substantial evidence in the record'" (alteration omitted). Jacobs, 488 Mass. at 600, quoting Commonwealth v. Velez, 487 Mass. 533, 540 (2021). "When, as here, the motion judge did not preside at trial, we defer to that judge's assessment of the credibility of witnesses at the hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record." Jacobs, supra, quoting Commonwealth v. Perkins, 450 Mass. 834, 845 (2008).

We cannot say that trial counsel's decision not to introduce the photographs through lay testimony was manifestly unreasonable when it was made, and so the motion judge did not err in denying the motion for a new trial on this issue. Furthermore, any error in failing to call expert witnesses on hair growth did not create a substantial likelihood of a miscarriage of justice.

ii. Lay testimony and photographs. Two sets of photographs of the defendant are in question -- with Tiara Galbreath on April 10, 2011, and with Chelsea Blake on April 22, 2011. The photographs were taken at the State prison where the defendant was incarcerated and from which the defendant escaped on April 24, 2011. At trial, defense counsel presented a letter to the judge from the defendant, discussing his disagreement with the decision not to introduce the Blake photographs[11] to demonstrate that he did not have cornrows at least one week before the shootings.

Defense counsel explained that they reached this decision after "a lot of back and forth" with the Commonwealth and discussion among themselves and with the defendant. Were they

---

[11] At the evidentiary hearing on the motion for a new trial, Galbreath testified that she gave photographs to trial counsel in May or June of 2011, but trial counsel had no recollection of receiving photographs from Galbreath. The only photographs the defense considered introducing at trial, therefore, were those of the defendant with Blake.

to introduce a photograph of Blake and the defendant taken at the prison, the Commonwealth wanted to raise the defendant's prison escape and opportunity to change his appearance in the eight days between the photograph and the shootings. In response to the parties' positions at sidebar, the trial judge indicated that she was "not going to permit the photograph to be introduced absent permitting the Commonwealth to explain the circumstances under which it was taken and . . . what could have happened between April 22 and April 30." Simply put, defense counsel did not want that information to come in and opted not to pursue that line of inquiry.[12]

---

[12] Nevertheless, defense counsel opened the door at trial to information about the escape by questioning one of the responding officers about the defendant having a warrant open for his arrest -- a line of questioning that the trial judge found not "necessary to ask . . . , in [her] opinion." Defense counsel also repeatedly referenced the prison escape in their closing argument. Even if we determined that these head-scratching decisions rose to the level of error, such error was not likely to have influenced the jury's decision, especially considering the eyewitness, ballistics, and DNA evidence presented that tied the defendant to the barbershop shooting and the Commonwealth's inability to tie directly the defendant's prison escape to the theory that King's son had shot the defendant's mother, precipitating the defendant's escape to seek revenge.

Any error made by trial counsel by not pursuing further lines of inquiry that reinforced the defendant's escape while potentially sowing some doubt as to what hairstyle he wore -- when such evidence already had been introduced and eyewitness testimony impeached on cross-examination -- did not, therefore, result in a substantial likelihood of a miscarriage of justice.

At the evidentiary hearing on the motion for a new trial, one of the defendant's trial counsel testified to the many factors weighed when making this decision, including the concerns about the Commonwealth's potential treatment of the Blake photographs.  Trial counsel believed that to call Blake was to "open up Pandora's box," as they were "concerned that [she] knew details that could really hurt [the] defense."  They even alluded to these concerns at sidebar on the last day of trial.

Counsel also testified that he and co-counsel "felt pretty good about the state of the evidence" they presented on the cornrows matter, which included a video from May 1, 2011 -- the day after the shootings -- of the defendant in the hospital, taken by a defense investigator, who also testified that he did not observe the defendant to have cornrows or braids of any kind that day, and the defendant's booking photographs, to argue that the defendant did not and could not have had cornrows on the day of the shootings.[13]

---

[13] Trial counsel called the Springfield police officer who took the defendant's booking photographs on May 6, 2011.  This officer testified that he had no idea what grooming or bathing the hospital had done for the defendant in the six days that he had been in the hospital at that point.  The pictures that the officer took, which were admitted as exhibits in evidence, show the defendant with some facial hair and his hair cut close to his head.

Although the defendant was clearly disappointed in his counsel's decision not to call Blake to the stand, "[t]he decision 'whether to call a witness is a strategic'" one, Jacobs, 488 Mass. at 602, quoting Commonwealth v. Morales, 453 Mass. 40, 45 (2009), especially insofar as evaluating the witness's credibility and preserving the integrity of the defense, see Jacobs, supra. In a sidebar discussion on the penultimate day of trial, defense counsel noted that, while the defendant wanted them "to call further witnesses on the issue of braids," they had discussed the issue and "made the decision, as experienced trial attorneys, to not present more evidence on this subject." The trial judge confirmed that they had "reviewed all of the pros and cons with respect to calling additional witnesses and . . . discussed that thoroughly with [their] client."

Where, as here, we can ascertain counsel's strategic and tactical reasons for not calling either Galbreath or Blake to the stand and introducing in evidence prison photographs of them with the defendant, we cannot say that trial counsel's decision was manifestly unreasonable. See Jacobs, 488 Mass. at 603. The motion judge properly denied, therefore, the motion for a new trial on this issue.

iii. Expert testimony. "The decision to call, or not to call, an expert witness fits squarely within the realm of

strategic or tactical decisions," and so "we evaluate whether the decision was 'manifestly unreasonable' at the time it was made" (citation omitted). Commonwealth v. Ayala, 481 Mass. 46, 63 (2018). At the evidentiary hearing on the motion for a new trial, the defendant called two expert witnesses: Joy Talbot, a barber instructor for the Department of Correction and member of the State Board of Registration of Cosmetology and Barbering, and Frederick Smith,[14] a previously licensed barber who was incarcerated with the defendant in State prison and cut his hair during this period. Talbot testified that hair grows, at most, one-half inch per month, and cornrowing hair requires a hair length of at least one and one-half inches -- meaning hair cut with the shortest clipper attachment would require at least three months of growth before it could be cornrowed -- but that as little as one-half inch of hair is needed to attach cornrow extensions. Talbot also testified that, when cornrows are removed, the hair may retain an indentation from the pattern.

She examined the photographs of the defendant with Galbreath on April 10, 2011, and opined that, while "[i]t is very difficult to tell, because [the defendant's] type of hair would stretch a little bit," his hair was likely too short to be

---

[14] Because of later references to a potential third-party culprit, Trevin Smith, by the surname Smith, we refer to Frederick Smith as "Frederick."

cornrowed at that time. As to the Blake photographs from April 22, 2011, she thought the defendant's hair appeared "a little bit shorter," thus "it might be more difficult" to cornrow, but it was "hard to tell." Finally, Talbot examined photographs of the defendant in his hospital bed on May 6, 2011. She concluded that the defendant's hair was too short to cornrow at that point, yet she could not determine whether he recently had removed cornrows. Furthermore, it was "hard to say" whether the defendant's hair could have had extensions, that it was "a little short, but not totally impossible," though removing extensions would "probably" result in patches of hair.

Frederick testified that he cut the defendant's hair with the shortest clipper attachment, one-sixteenth of an inch, approximately every two weeks for "a few months" while they were incarcerated together, beginning sometime in 2010 or 2011. From his perspective, the hair length needed to be "[a]t least three to four inches" to cornrow and that would have taken the defendant "[a]t least six months" to grow out, but Frederick also conceded that he did not know how to cornrow hair and could not recall when he last gave the defendant a haircut.

The defendant argues that, had the jury heard Talbot and Frederick's testimony, they would have discredited King's identification of the defendant as the barbershop shooter, along with testimony from Wright, Gregorczyk, and Springfield police

Officer Patricia Capoza that the defendant had cornrows when they saw him at the Burr Street house.  The testimony of these expert witnesses is not the "smoking clippers" that appellate counsel makes it out to be, however; as the motion judge noted, neither Talbot nor Frederick was able to say definitively how long the defendant's hair was and, thus, whether he could have had cornrows on the day of the barbershop shooting.

Furthermore, although trial counsel conceded that he and co-counsel did not investigate expert testimony "on whether the hair shown . . . was susceptible to braiding or cornrowing" and that such testimony "couldn't have hurt," the defense also presented video and photographic evidence from their investigator to counterbalance the Commonwealth's eyewitness testimony that the defendant had braids and was the barbershop shooter -- images that the Commonwealth conceded in their closing portrayed his hair as "extremely tight to his head," so tight "that you can see the outline of where the hair goes."

At trial, defense counsel challenged the identification of the defendant as the barbershop shooter and as the intruder at the Burr Street house by cross-examining King, Wright, Gregorczyk, and Capoza about seeing a man with cornrows.[15]  For

---

[15] Defense counsel pointed out that King saw the defendant for only "a fraction of a second" prior to the shooting, at which point he tried to take cover, and Gregorczyk also only saw

example, defense counsel pointed out that, given that King was a

barber, the shooter's hairstyle would have stood out to him.

But many eyewitnesses provided details about the person they saw

beyond his hairstyle -- details that ultimately corroborated

their identification of the defendant as the shooter at the

barbershop and as the individual who stashed a gun at the Burr

Street house.  King recalled staring into the "red" eyes of the

barbershop shooter -- a detail corroborated by Gonzalez, who

stared into the defendant's "bloodshot" and "wide open" eyes

while he was in the trunk of the Impala in the driveway.  Carter

also testified that, inside the Burr Street house, she saw

"[h]is whole face, mainly his eyes," which were "very big and

bloodshot red,"[16] and that she recognized the defendant from the

---

the defendant for mere seconds in the trunk before he was shot.
With regards to Wright, defense counsel attacked her
credibility, drawing attention to conflicting statements in her
police statement the day of the incident, her statement to the
defense investigator one year later, and her statement to
prosecutors two years after the incident.  As to Capoza, defense
counsel pointed out that she was relying on her memory of events
from two years prior, having been recently contacted by the
Commonwealth to testify, and without the benefit of refreshing
her recollection from her contemporaneous police report, which
could not be located.

[16] Carter provided murky testimony as to the defendant's
bloodshot eyes.  On cross-examination, defense counsel
established that Carter did not include that detail in her April
2011 statement to police, leading her to answer "no" to
counsel's question, "So that wasn't true, was it?"

neighborhood, while Wright similarly recalled the defendant's "big and scary" eyes.

Given the lack of conclusive testimony on the defendant's hairstyle offered by Talbot and Frederick at the evidentiary hearing on the motion for a new trial, the extent to which defense counsel challenged the evidence presented on the defendant's hairstyle at trial, and the extensive evidence connecting the defendant to the barbershop shooting, including the damning ballistics and DNA evidence, discussed infra, we "conclude that the proffered testimony would have been unlikely to have changed the jury's conclusion." Don, 483 Mass. at 707. Talbot was unable to determine definitively that the defendant's hair was too short to cornrow or attach cornrow extensions, and Frederick neither knew how to cornrow nor could testify as to when he last cut the defendant's hair to establish its length on the day of the shootings. Failing to call such experts, therefore, did not amount to "a substantial likelihood of a miscarriage of justice." See id. at 704.

b. Eyewitness identification. The defendant next argues that trial counsel ineffectively assisted him by failing to present expert testimony on the unreliability of eyewitness identification in support of his motion to suppress King's identification of the defendant as the barbershop shooter, as evidence at trial, and in support of his proposed jury

instruction on the fallibility of eyewitness identification. The defendant claims that, had such testimony been presented in support of the motion to suppress, the evidence of King's identification of the defendant as the barbershop shooter would have been excluded from trial.[17]  In the alternative, the defendant argues that, even if the trial judge would still have denied the motion to suppress and admitted King's identification, an eyewitness identification expert's testimony would have impeached the reliability of King's identification before the jury.

Specifically, the defendant argues that expert testimony would have called into the question the accuracy of King's identification based on (i) "impermissibly suggestive identification procedure[s]" used by the police when presenting King with a photographic array and (ii) various environmental conditions under which King saw the barbershop shooter that can lead to mistaken identification.  Having raised these arguments in his motion for a new trial and presented such testimony at an evidentiary hearing,[18] the defendant further argues that the motion judge erred in denying a new trial on these grounds.

---

[17] The motion to suppress also addressed Ball's identification, but that is not at issue on appeal.

[18] The defendant called Dr. Deah Quinlivan, a tenured associate professor of psychology at Florida Southern College,

We review the defendant's ineffective assistance of counsel claims "for a substantial likelihood of a miscarriage of justice."  Don, 483 Mass. at 704.  We also "review a decision on a motion for a new trial for an abuse of discretion" and "defer to that judge's assessment of the credibility of witnesses at the hearing on the new trial motion" (citation omitted).  Jacobs, 488 Mass. at 600.  Because the motion judge was not the trial judge, however, "we regard ourselves in as good a position as the motion judge to assess the trial record" (citation omitted).  Id.

i.  Photographic array procedures.  Prior to trial, the defendant sought to suppress King's identification of him as the barbershop shooter, arguing that the array procedure was unduly suggestive because only the photograph of the defendant in the array featured a man with braided hair -- a photograph that had been circulated by the media to publicize the defendant's recent escape from prison.  At the motion for a new trial stage, the defendant also submitted that the police presented the photographs to the defendant in an impermissibly suggestive way by not adhering to the recommended double-blind, sequential procedure.

---

with eighteen years of experience researching eyewitness identification.

A.  Distinctiveness.  In support of the motion to suppress and at trial, the defense called the Springfield police detective who developed the frontal view array.  The detective testified on standard photographic array procedures and the process that he used.  From the detective's perspective, the frontal view photograph of the defendant depicted him with "[s]hort black hair that's close to his head," and so he compiled seven other frontal view photographs that had the same hairstyle and "[v]ery similar forehead[s]," from a computer-generated selection based on the defendant's age, race, ethnicity, skin color, height, and weight.[19]  The detective also noted that King would have signed a protocol form that contained a warning that some features shown in a photograph, such as hairstyle, may change.

King testified, at both the motion to suppress hearing and at trial[20] that, while he thought the shooter was wearing braids, he also saw the shooter's entire face, including his red eyes, and that he recognized him immediately as the defendant -- a young man he had seen on the news recently and who had grown up

_____

[19] The detective did not, however, construct the profile view array that shows the defendant with a cornrow-like hairstyle and was unaware of the corresponding profile view photograph of the defendant and the hairstyle it would depict.

[20] The defense called King at the motion to suppress hearing, but he was the Commonwealth's witness at trial.

in the neighborhood.  The trial judge, denying the motion to suppress after an evidentiary hearing, determined that King made the identification "as a result of [his] proximity to the defendant on April 30 at the barbershop"; having seen the defendant's "facial features and braided hair," King "immediately recognized him as a person from the neighborhood who was a friend of his son's and also as the man who recently escaped from prison."

On this point, that the photograph of the defendant in the array was unduly suggestive because he is the only person with braided hair, the proffered expert testimony would not have affected the trial judge's denial of the motion to suppress. The expert merely posited that King, as a Black barber, may have noticed the cornrows in the photograph better than, for example, a white police officer less familiar with hairstyles, especially culturally Black hairstyles.  Having reviewed the frontal view photographic array shown to King, we agree with the trial judge that the array is hardly suggestive; the defendant's "hair style is not distinctively different from the others," as the featured braids are barely, if at all, distinguishable from a short, close-to-the-scalp style.  See Commonwealth v. Montez, 450 Mass. 736, 756 (2008).

We conclude that, even with such expert testimony, there was no likelihood that the trial judge would have suppressed

King's testimony, given King's emphasis on distinguishing physical traits of the shooter -- including his eyes, as well as his hair -- and King's prior familiarity with the defendant. See Commonwealth v. Thornley, 406 Mass. 96, 100 (1989) ("A witness's unequivocal testimony that he was not relying on a distinctive feature will considerably neutralize any suggestiveness in the photographic array").  Because the proffered expert testimony would not have changed the outcome of the motion to suppress King's identification, the evidence of King's identification of the defendant in the array as the barbershop shooter would still have gone to the jury.

Furthermore, we cannot say that the failure of the defendant's trial counsel to call an expert witness to testify at trial as to the potential suggestiveness of the defendant's hairstyle in the photographic array was likely to have influenced the jury's conclusion, see Don, 483 Mass. at 704, given King's identification of the defendant based on his facial features and familiarity from the neighborhood, as well as the physical evidence against the defendant, including the DNA on the gloves and sweatshirt and the gun recovered from the defendant in the trunk of the car that matched the ballistics evidence collected from the barbershop.  Any error, therefore, did not create a substantial likelihood of a miscarriage of justice.  Id.

B.  Presentation.  Defense counsel also elicited testimony, at both the motion to suppress hearing and at trial, from two of the State police troopers present for King's array-based identification to describe how the photographs were shown to King and how he made his selections.  The photographs were shown to King "one by one," during which he put four to the side. Then, he picked out two from the four, and finally, he selected the defendant's photograph as the person who shot him in the barbershop.[21]  While some of the troopers present knew the defendant, the troopers testified at the motion to suppress hearing and at trial that the trooper providing King with the photographs "had no knowledge of anybody in the photo arrays."

This court has emphasized that "the absence of [a double-blind] procedure" and "the choice of a simultaneous rather than a sequential display of photographs shall go solely to the weight of the identification, not to its admissibility." Commonwealth v. Silva-Santiago, 453 Mass. 782, 797, 798-799 (2009).  In this case, while police did not conduct a strictly double-blind, sequential array, they did take precautions to

---

[21] At the motion to suppress hearing, one trooper testified that King said that the defendant's picture "mainly looked like the guy" who shot him and, "That's the kid -- that's the boy who shot me."  At trial, the other trooper corroborated this, testifying that King's comment that the defendant's photograph "mainly" looked like the barbershop shooter and that King also said, "Yeah, that's definitely the boy who shot me."

promote accuracy, on which they testified at the motion to suppress hearing. On this point, therefore, additional expert testimony would not have changed the outcome of the motion to suppress, and King's identification would have still gone to the jury.

Furthermore, we cannot say that failure to call an expert witness to testify at trial as to the potential suggestiveness of the array's presentation to King was likely to have influenced the jury's conclusion. See Don, 483 Mass. at 704. The array was not unduly suggestive, and there was more than ample evidence identifying the defendant as the barbershop shooter; thus, there was no substantial likelihood of a miscarriage of justice. See id.

ii. Environmental conditions. The defendant argues that, had trial counsel presented expert testimony on the environmental conditions (also referred to as estimator variables) that increase the likelihood of a mistaken identification, then King's identification of the defendant as the barbershop shooter would have been suppressed or, in the alternative, the testimony would have affected the jury's evaluation of King's identification at trial. We are not persuaded.

At the evidentiary hearing on the motion to suppress, the defendant's trial counsel challenged the accuracy of King's

identification based on these conditions -- his short exposure time to the shooter under extremely stressful conditions; the likelihood of his fixating on the weapons, as opposed to the face of the person holding them; and the risk of unconscious transference due to his familiarity with the defendant from the community and media reports of the defendant's recent escape from prison. In his motion to suppress, the defendant argued that King "had a limited opportunity to observe the" barbershop shooter, given how quickly events unfolded and the shooter's face being at least partially obscured by the hoodie. At the suppression hearing, defense counsel further elicited from King that he saw the defendant's face for just "[a] fraction of a second" prior to him pulling a gun on King. Expert testimony on these factors would not have changed the outcome of the motion to suppress, as it did not bear on the admissibility of King's identification.

At trial, defense counsel further attacked King's identification of the defendant as the shooter, both on cross-examination and in closing argument. They emphasized how King's recollection of the shooter's features was based on viewing his face, partially obscured by the hoodie over his head, again for a "fraction of a second," not to mention the lack of description of any physical features in King's statement to police. Defense counsel also impeached King's credibility by pointing to various

pieces of testimony, such as what King said to the shooter, recognizing him from the community, and various clothing items worn by the shooter, that did not appear in his contemporaneous statement to police, as well as his contradictory testimony before the grand jury that the shooter was not wearing a black T-shirt in addition to the black hoodie.

As to the expert testimony's potential effects at trial, the motion judge correctly noted that the testimony had the potential to be a double-edged sword for the defense, potentially helping the defendant's case on the one hand but hurting it on the other. The various effects on the accuracy of identification due to stress, time, familiarity with the defendant, and the display of weapons would apply differently to different witnesses -- several of whom identified the defendant after observing him under different conditions with different levels of prior familiarity, or absence thereof.

Most importantly, there was incredibly damning physical evidence unrelated to this expert's testimony, including ballistics evidence that connected the barbershop shooting to the firearm found in the possession of the defendant, the defendant's DNA found inside gloves that matched the description of the shooter's gloves, DNA found inside a sweatshirt that matched the shooter's sweatshirt, and the gunshot residue on the

gloves and the black sweatshirt.  In sum, overwhelming evidence
identified the defendant as the barbershop shooter.

Finally, at the time of trial, expert evidence on
eyewitness identification was still being developed and was not
commonly introduced at trial; defense counsel did not have the
benefit of our opinion in Commonwealth v. Gomes, 470 Mass. 352,
367, 376 (2015) (Gomes I), which recognized evolving research on
eyewitness testimony and incorporated it into our jurisprudence,
albeit prospectively.  See Commonwealth v. Gomes, 478 Mass.
1025, 1025-1026 (2018)(Gomes II).[22]  We, therefore, discern no
error by trial counsel in failing to include the expert evidence
proposed at the motion for a new trial.  We also emphasize that
even if such evidence had been available and had been introduced
at the time of trial, it was not likely "to have influenced the
jury's conclusion," particularly given the ballistics and DNA
evidence.

c.  Third-party culprit evidence.  The defendant argues
that the trial judge improperly excluded proffered evidence that
a third-party culprit -- another man from the neighborhood,

---

[22] We also agree with the motion judge that Gomes II
precludes a finding of ineffectiveness for failing to present
expert evidence necessary to support the New Jersey eyewitness
identification instruction.  As we explained in Gomes II, 478
Mass. at 1026, "[a]n attorney who would make such an effort is
worthy of commendation by the defense bar, but the attorney who
does not can hardly be deemed incompetent."

Trevin Smith -- was the barbershop shooter.  He also argues that the motion judge, when presented with additional third-party culprit evidence, failed to properly consider it and erroneously denied the motion for a new trial on that ground.  We review each argument in turn.

As this court has explained, "[a] defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it" (citation omitted).  Silva-Santiago, 453 Mass. at 800.  Indeed, "[w]e have given wide latitude to the admission of relevant evidence that a person other than the defendant may have committed the crime charged."  Id. at 800-801.  "If the evidence is 'of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility.'"  Id. at 801, quoting Commonwealth v. Conkey, 443 Mass. 60, 66 (2004), S.C., 452 Mass. 1022 (2008).  Nonetheless,

> "this latitude is not unbounded.  The limitations are twofold.  First, because the evidence is offered for the truth of the matter asserted -- that a third party is the true culprit -- we have permitted hearsay evidence that does not fall within a hearsay exception only if, in the judge's discretion, the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other substantial connecting links to the crime" (quotations and citation omitted).

Silva-Santiago, supra.  "Second, the evidence, even if it is not hearsay, 'must have a rational tendency to prove the issue the

defense raises, and the evidence cannot be too remote or speculative.'"  Id., quoting Commonwealth v. Rosa, 422 Mass. 18, 22 (1996).  Because "the exclusion of third-party culprit evidence is of a constitutional dimension," we examine it independently.  Id. at 804 n.26.  If the evidence was improperly excluded, then we determine "whether the error was harmless beyond a reasonable doubt."  Conkey, supra at 70.

At trial, the defendant first sought to introduce testimony from Smith's long-time girlfriend, Karen Fuller,[23] in support of a third-party culprit defense that Smith was the barbershop shooter.  After a voir dire of Fuller, the trial judge found that Fuller's testimony on what Smith was wearing (a black hooded sweatshirt), his hairstyle (braids), and seeing him in a car in the neighborhood on the same day as the barbershop shooting was "not enough of a substantial connecting link . . . to permit the introduction of third-party culprit evidence." The judge permitted Fuller to testify, however, as to "what she

_____

[23] The defendant also initially intended to introduce testimony from two other witnesses, but one invoked her right against self-incrimination under the Fifth Amendment to the United States Constitution and did not testify, and trial counsel opted not to call the other witness, a minor, and instead presented a stipulation.

did" on the day of the shootings "but not what . . . Smith said to her over the telephone."[24]

The defendant asserts that the trial judge erred in her ruling. Indeed, when denying the introduction of third-party culprit evidence, the trial judge conflated the "substantial connecting link" limitation required to admit a certain type of evidence -- otherwise inadmissible hearsay, see Silva-Santiago, 453 Mass. at 801 -- with the general limitation on all proffered third-party culprit evidence -- that it "must have a rational tendency to prove the issue the defense raises, and the evidence cannot be too remote or speculative," id., quoting Rosa, 422 Mass. at 22. Quoting Rosa, however, the trial judge went on to say that the evidence was too speculative to prove that Smith was the barbershop shooter. For example, she noted: "a black hoodie and jeans . . . is such a common urban outfit, especially on a Saturday. That, you know, I could -- that's something I may wear on a Saturday."

Although the trial judge erred in part of her reasoning, the defendant still presented, through Fuller's testimony, the evidence he sought to admit -- Smith's hairstyle (including a

---

[24] Fuller testified that, at around noon on the day of the shootings, Smith told her to drive her car, a gray Chevrolet Impala, to the Burr Street house, back into the driveway, open her trunk, and then wait for his cell phone call with further instructions. She complied. It is from this car's trunk that the defendant was apprehended.

photograph of Smith with braids, as he appeared on the day of the barbershop shooting); attire (black hooded sweatshirt); and whereabouts on the day of the shootings.  As to Smith's alleged "flight from the scene," the defense called the trooper who took Fuller's statements.  The trooper testified that Fuller described Smith as being "hot and sweaty" when she saw him on the day of the shootings.  The defense also argued their third-party culprit theory at closing.  For these reasons, any error by the trial judge was "harmless beyond a reasonable doubt."  See Conkey, 443 Mass. at 70.

The defendant also appeals from the denial of his motion for a new trial on these grounds, arguing that the motion judge misunderstood the significance of additional third-party culprit evidence presented for the first time at the postconviction stage:[25]

> "(i) Smith's statement to police containing details of Smith's flight to New York after the shootings; (ii) evidence of a shooting that occurred four days earlier in a location close to the barbershop; and (iii) evidence that witnesses at [the Burr Street house] lied about Smith's presence at the house close in time to the barbershop shooting."[26]

---

[25] On his motion for a new trial, the defendant argued that his trial counsel were ineffective for not presenting at trial certain additional evidence, discussed infra.  At this stage, however, he argues solely that the motion judge erred in evaluating that evidence as presented.

[26] The defendant also argues that the motion judge erred by considering the proffered third-party culprit evidence

For the reasons stated by the motion judge, we discern no error. As the motion judge explained, Smith's statement to police "would have been more harmful than helpful to the defendant." He directly implicated the defendant in the shootings, including providing support for a damaging theory that the defendant committed the barbershop shooting in retaliation for his mother having been shot a week prior. Furthermore, Smith's flight to Brooklyn and destruction of the cell phone he used to communicate with the defendant supported the Commonwealth's theory that he was implicated in directing Fuller to the Burr Street house to help the defendant flee -- just as much as, if not more than, it supported the defense's theory that he committed the barbershop shooting.

The defendant also suggested in his motion for a new trial that evidence of a shooting that happened four days prior to the barbershop shooting and took place "approximately two blocks" away supported the defense that Smith was the third-party

---

singularly and ignored its cumulative effect with expert testimony presented on the cornrows and eyewitness identification issues. This argument has no merit, however, as the motion judge explicitly considered the cumulative effect of all asserted errors and the evidence presented at the evidentiary hearing on the motion, including the excluded third-party culprit evidence, and determined that there was no substantial likelihood of a miscarriage of justice in this case given the weight of the evidence against the defendant. Having discussed, supra, the overwhelming implications of the ballistics and DNA evidence against the defendant, we agree.

culprit.  Witnesses, including King, saw "a [B]lack male, wearing a black hooded sweatshirt . . . and jean[s]" firing at a vehicle and that he fled in "a silver car with Tennessee plates" that was later found parked next to the Burr Street house.  The police also recovered a pair of gloves similar to those found at the Burr Street house.  As the motion judge explained, however, none of this evidence implicated Smith in the barbershop shooting any more than it exonerated the defendant, whose DNA was found on the black gloves and a black hoodie recovered from the Burr Street house, where witnesses saw him after the barbershop shooting and police apprehended him.

Finally, the defendant proffered statements made by Carter and Baulkman to demonstrate that they "lied about Smith's presence" at the Burr Street house.  The motion judge noted, however, that defense counsel successfully impeached Carter's testimony at trial, establishing that she "initially told police that Smith was not at" the Burr Street house but then testified on cross-examination that she saw him leave when she arrived that morning.  As to Baulkman, the motion judge found that the statement, from a person who did not testify at trial, also did not support the defendant's proffered third-party culprit defense that Smith committed the barbershop shooting.  We agree; in fact, at trial, the defendant established through Fuller's

testimony that Smith was in a car in Fuller's driveway at the time.

Having reviewed the evidence presented on the motion for a new trial, we discern no error by the motion judge when he denied the motion after considering the proffered additional third-party culprit evidence at the postconviction stage.

d.  Review under G. L. c. 278, § 33E.  We have reviewed the record in accordance with G. L. c. 278, § 33E, and discern no basis to set aside or reduce the verdict of murder in the first degree or to order a new trial.

3.  Conclusion.  For the foregoing reasons, we affirm the defendant's convictions and the denial of the defendant's postconviction motion for a new trial.

So ordered.